GEORGE O. WEST, III
Nevada Bar No. 7951
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 664-1168
Email: gowesq@cox.net

E. ADAM WEBB [*Pro Hac Vice Pending*]
Georgia Bar No. 743910
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E., Suite 480
Atlanta, Georgia 30339
Telephone: (770) 444-0773
Email: Adam@WebbLLC.com

Attorneys for Plaintiff
A.M. HAMILTON

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| A.M. HAMILTON, an individual, on behalf of himself and all others similarly situated, | ) ) ) Case Number: |
| Plaintiff, | ) ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** ) ) |
| BANK OF AMERICA, N.A., | ) ) ) |
| Defendant. | ) ) |

      Plaintiff brings this action to bring an end to the egregious practices of Defendant Bank of America, N.A. (the "Bank" or "BoA") that continue to harm Nevada's most vulnerable citizens.  The Bank made promises to all recipients of unemployment insurance in Nevada but – when BoA found the promises difficult and expensive to honor – it promptly disavowed its promises and breached its commitments.  This case asks to make the victims whole.  In support, Plaintiff states as follows:

**JURISDICTION, VENUE, AND THE PARTIES**

1. BoA has massive operations in the State of Nevada. The Bank has dozens of branches and hundreds of ATMs throughout the State, holding billions of dollars of deposits for Nevada's citizens and businesses.

2. Not content with its standard banking profits, the Bank also initiated a multi-billion-dollar project to service all recipients of unemployment for the State of Nevada.

3. There is no question as to the Bank's size and scope in Nevada and Clark County. The Court has personal jurisdiction over Defendant because BoA has many branches and facilities, thousands of employees, and hundreds of thousands of customers in the State.

4. Venue is proper in Clark County because Defendant has substantial operations in this County and a substantial portion of the events or omissions giving rise to the claims occurred in Clark County.

5. Plaintiff A.M. Hamilton is an individual consumer. Plaintiff was an employed citizen of Nevada until he lost his job due to disruptions of the COVID 19 Pandemic in May of 2020. He began to receive unemployment benefits shortly thereafter.

6. After receiving a new job in California, Plaintiff moved to California where he now lives.

7. This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000, exclusive of interest and costs.

8. Plaintiff alleges that the total claims of individual Class Members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28

U.S.C. §§ 1332(d)(2) and (6).  Plaintiff is a citizen of the State of California, whereas Defendant is a citizen of North Carolina for purposes of diversity.  Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).  Furthermore, Plaintiff alleges that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

9. Venue is proper in the District because BoA has at least 60 bank branches in Nevada, and tens of thousands of unemployment benefit recipients were issued Bank of America prepaid debit cards in this District.

10. Indeed, Nevada's unemployment rate reached a peak of 30.1% in April of 2020, with over 400,000 citizens receiving unemployment.  Due to its tourism and gaming focused economy, Nevada has had the highest unemployment rate in the country during most of the Pandemic.  Not all of these unemployed Nevadans were victimized by BoA but, as described below, many were.  It is hoped that this action will afford such victims a just recovery.

## GENERAL ALLEGATIONS

**A.    BoA Agrees to Service Nevada's Unemployment Program.**

11. The Nevada Department of Employment, Training, and Rehabilitation ("DETR") oversees the payment of unemployment benefits in Nevada.

12. In 2016, DETR sought to simplify unemployment insurance payments by contracting with a third-party to provide debit cards to all unemployment recipients.  This program had been implemented in other states and promised savings for the State and convenience for customers.

13. DETR reached agreement with BoA to administer the program.  Pursuant to the agreement, the Bank would send debit cards to all unemployment recipients.  Each time the beneficiary was to receive payment from DETR, the money would be uploaded to the

recipient's debit card account.  The unemployed person would thus have easier and more immediate access to their funds.

14. In May of 2016, BoA began to administer the program.  There were well below 100,000 monthly unemployment insurance recipients at that time.

15. Although there were numerous complaints about BoA's practices from 2016 through 2020, the program was generally seen by both DETR and BoA as a success.  BoA pocketed millions of dollars from its fees for administering the program.

**B.     The Pandemic Strains the Unemployment System.**

16. When the COVID 19 Pandemic began to ravage the country in 2020, no state was harder hit than Nevada.

17. The State went from an historically low unemployment rate of 3.6%, or roughly 50,000 Nevadans, to an historically high unemployment rate of 30% just months later.  Roughly nine times as many Nevadans were unemployed, or nearly 450,000 persons, in April 2020 than had been in December of 2019.

18. This placed understandable strains on the unemployment system.  Most noticeably, the process of filing for, and being accepted for, unemployment benefits, was often delayed.

19. BoA does not participate in those aspects of the unemployment insurance system.  It did, however, suffer from its own problems, namely increased fraud in its unemployment insurance debit card programs, not just in Nevada but in the various other states where it does business.

20. BoA had procured the contract with Nevada by making various assurances about its expertise at maintaining customer account integrity and its top-of-the-line technology that would safeguard accounts.  Such promises were not based on fact.  As soon as hackers began to attack the Bank's systems, the security of many thousands of customer accounts was breached.

21. BoA was unable to stop the hacking attacks and identity thefts. Ultimately, rather than bringing its systems and procedures up to the level necessary to prevent such hacking and thefts, the Bank threw in the towel and told Nevada – and other states – that, in actuality, it could not properly ensure the security of payments for the state unemployment system.

22. BoA's quick exit from the Nevada program may have been allowed pursuant to its agreements with the State, but there was a glaring deficiency in its "cut and run" strategy: the Bank knowingly cut off the program while thousands of Nevadans were still owed funds. In order to get Nevada's business, the Bank had promised to make these victims whole, and it must do so. BoA made ***profits of $7 billion*** in the last quarter alone. There is no question that the Bank and easily afford to honor its promises to Nevadans.

C. **BoA Is Replaced by DETR.**

23. When BoA quit the program, Nevada was forced to find another provider. In July of 2021, the new provider took over the program. The last day that newly unemployed were sent payments on the BoA card was June 29, 2021.

24. The Bank has sought to extricate itself from the Nevada unemployment program "on the cheap" and without honoring its promises to its customers. For example, BoA has announced a series of "drop dead" dates by which customers must remove all of their funds from their accounts.

25. In June 2021, the Bank announced that all amounts had to be withdrawn by October 1, 2021. Based on the deficiencies outlined below, thousands of customers did not withdraw their funds by the appointed date and the date had to be extended.

26. The following was posted by DETR after the shift in debit card providers:

**\*\*IF YOU STILL HAVE A BANK OF AMERICA BENEFIT CARD:**

- **Spend or withdraw any remaining funds on your Bank of America card prior to December 31, 2021. To obtain the current balance on your Bank of America card, you can visit the Bank of America cardholder website at www.bankofamerica.com/nevadauidebitcard. You can spend down the funds on that card as you normally would, or you can transfer the balance to a bank account through the Bank of America cardholder website.** Funds cannot be transferred from your Bank of America card to your Way2Go Card®.

- **To retrieve funds remaining on your Bank of America card after December 31, 2021, call the number on the back of your card.** Bank of America will assist you with obtaining your remaining balance with options including the ability to transfer funds to an existing checking or savings account through the "Transfer Funds" option on the Bank of America cardholder website, or through an Emergency Cash Transfer (Western Union). If you require the funds by check, it will take additional time to process. **If you request a check, you will not have access to your money until the check is processed and you deposit or cash the check, so it is important to use or withdraw those funds before the December 31, 2021 deadline to avoid delays.**

- **If your Bank of America card is lost or stolen,** replacement cards will only be issued prior to September 1, 2021. If your card is reported lost or stolen after September 1, 2021 you will need to contact Bank of America at (888) 339-8569 to retrieve your funds.

- Bank of America may close your existing account at any time on or after July 1, 2021, and your account remains subject to the terms of the Bank of America Cardholder Agreement.

DETR Webpage, "Unemployment Debit Card" (last viewed on February 15, 2022 at https://detr.nv.gov/page/Unemployment_Debit_Card).

27. Despite the Bank's effort to escape the Nevada unemployment program without further losses, BoA's obligation to make each customer whole survived the termination of its contract with DETR.

### INDIVIDUAL ALLEGATIONS

28. Plaintiff moved to Nevada to work in the food service industry in 2018. He accepted a job and bought a home in Clark County.

29. After the COVID 19 Pandemic hit in early 2020, Plaintiff's company's business, which consisted largely of providing food items to casino hotels and other tourist-oriented businesses, was crushed. Based on the Pandemic, and through no fault of his own, Plaintiff was let go by his employer in May of 2020.

30. Plaintiff applied for unemployment and was accepted into the program.

31. He was sent a Bank of America Mastercard Debit Card to receive his payments.

32. The payments showed up on a regular basis for several months. Plaintiff had no problem with the program.

33. In October of 2020, Plaintiff accepted a job offer and notified the State of Nevada. Plaintiff destroyed his Bank of America Mastercard Debit Card.

34. Plaintiff did not think about the BoA program again until he received a Form 1099 from DETR in January of 2022. The 1099 showed that Plaintiff had been paid $3,000 in the year 2021.

35. Plaintiff had never received the $3,000 and had never been notified that his account had been reactivated. There was literally no notice that he had been paid these funds, not by mail, email, text message, or telephone call. BoA had in its records all of Plaintiff's contact information and easily could have contacted him.

36. Pursuant to the federal government's Coronavirus Aid, Relief, and. Economic Security Act ("CARES Act") program, which was adopted in March 2020, all unemployment recipients were eligible for additional payments of $600/week between March 29 and July 25, 2020. The payment to Plaintiff likely came as part of the CARES Act program. A similar payment was provided to thousands of other unemployed or previously-unemployed Nevadans.

37. Plaintiff immediately contacted DETR and filed a fraud claim on January 20, 2022.

38. On January 21, 2022, a DETR employee called Plaintiff and stated that the funds had been transferred from DETR to Plaintiff's BoA account. Plaintiff stated that he had never received any notice of the funds. The DETR employee stated that it is a common problem and that there have been many such calls.

39. The DETR employee stated that Plaintiff would be hearing from DETR about recovering the funds held by BoA.

40. Five weeks have passed with no further word from DETR or BoA. Plaintiff has called back the number that he was called from on January 21, 2022, but has had no success in reaching the DETR employee he spoke with or anyone else with knowledge of the problem.

41. Plaintiff has tried to login to his old BoA account but has not been able to do so.

42. The DETR/BoA webpage says to call into the number on the back of the card but Plaintiff no longer has his destroyed card.

43. Plaintiff has run out of options in seeking to obtain his $3,000 held by BoA. Further, he will soon have to file his taxes. He will either have to report $3,000 in income he did not receive or he will have to risk criminal and civil penalties for underreporting income to the Internal Revenue Service.

## CLASS ALLEGATIONS

44. Plaintiff brings this action on behalf of himself and all others similarly situated. There are two proposed classes: the Zero Liability Class; and the Remainder Funds Class.

45. The Zero Liability Class is preliminarily defined as: "All Nevada unemployment insurance debit card account customers of Bank of America who suffered a loss based upon an unauthorized transaction."

46. The Remainder Funds Class is preliminarily defined as: "All Nevada unemployment insurance debit card account customers of Bank of America who had funds remaining in their account as of the date of filing of the Class Action Complaint."

47. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors; any entity in which Defendant has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

48. The relevant statute of limitations (six years) covers the entire period at issue.

49. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

50. *Numerosity*. The members of the Classes are so numerous that individual joinder of all the members is impracticable. From May of 2016 until July of 2021, the Bank serviced all or nearly all unemployment recipients in Nevada. Nevada's unemployment rate during this time has exceeded the national average. For many months during the relevant period, there were over 100,000 persons receiving unemployment insurance in the State. For example, in July of 2021, when BoA stopped accepting new customers from DETR, there were 121,600 unemployed Nevadans receiving benefits. After thousands of incidents of fraud which BoA failed to stop, and for which it refused to make victims whole, the Bank quit the program. The total number of victims is not known, but it is certainly thousands of Nevadans.

51. Hundreds, if not thousands, of detailed complaints from BoA victims can be found online. A small sampling of such complaints from online site Reddit illustrate the scope of the problem. One such complaint stated:

> Has your debit card for Bank of American been frozen recently?
> Mine has. I had $103.85 on it and then was notified by Netflix my payment was declined. I took out my phone and checked my app for BofA. It showed a withdraw from a BofA ATM for $100. I hadn't left the house in a week. I called the card service number on the back of the card and found out the withdraw was from an ATM in Brooklyn New York. I had to start a fraud investigation. This happened on Dec. 21. At 10:30 that night I received an email from BofA saying

CLASS ACTION COMPLAINT
9

the status of my account had changed. I thought, well the fraud case. No. They closed my account. When I called them the next day, Dec. 22, they said Nevada Unemployment closed my account, not them. So then I had the nightmare of trying to get through to Nevada Unemployment. While on hold, I clicked on contact us on the top of my claimant page. There was a number for the fraud division, so I hung up and called them. I was told to email my Driver License, front and back, and my social security card, front and back, to a email address they provided so they could upload it into the system and verify my identity. I did that on Dec. 22 and was told it would 5-7business days because it has happened to thousands of people. This was a Tuesday, a day I have been getting deposits to that card since early April. No payment that day. No access to money since. On Dec. 29 they did deposit the week5 payment of the Lost Wages program from August 19 or something.

I have since found out that even when the documents are verified and Nevada Unemployment tells Bank of America my account is good, I cannot access any money until I have a new debit card. We do not have accounts at Bank of America. You must have a debit card to withdraw funds, even if you can prove your identity, the money is not yours until you have the debit card. I have continued to file my weeks, but still have zero dollars.

I thought I was a victim by having someone withdraw $100 illegally in New York, but I was wrong. Nevada Unemployment has made me feel like an even bigger victim by holding up funds I need because as they say, they are totally jammed upby all the other people this has happened to.

If you are an Attorney, can I start a class action lawsuit?

Another customer stated:

Hey i live in nevada and know at least 3 people living in nevada rn whose going through this here's my story someone withdrew $700 from my account, submitted a claim 2 days later my account is frozen, did what you did, ID and social was confirmed, letter sent to boa to unlock and nothing... I would give it 7 more days, that's what the fraud department told me, so give it to next week, it should be open.. hopefully. My weekly payments are held up as well, LWA included 👱 ♂

Yet another BoA customer offered:

Also i did get a new debit card, and it is still closed. The debit card doesn't really mean anything, it's the account. The account has to reopen again so the new debit card could work. It sucks idk what DETR is doing or BOA, but I really regret reporting that fraud claim, because my account is frozen and my weekly payments are held up including the new $300. I feel like i'm getting punished for someone stealing from me.

Another stated simply:

I feel like I'm being punished too.

Another customer related:

I'm going through the same thing and it's been a month since I submitted my documents and 3 weeks since I verified with DETR that I've done everything im supposed. Account is still frozen.
Ditto with the debit card. I have the new one but it's useless until the account is unfrozen.
I was furloughed in August and still have not been able to file because a fraudulent user attempted to gain access to my old account from 2008 (to try to file under me). My account is under lock and key with the fraud team and though I was promised a call back from an adjudicator the week of October 11th (to get the old account wiped completely, so that I can create a new one), still nothing. I know of others who were furloughed earlier than myself who still haven't seen a penny, either. It's freaking horrible from start to finish. 😩

One customer stated simply:

Sue Bank of America, they're the ones putting the locks on all of the cards

Another recounted:

My card was used at Wells Fargo and they took out 160$ and I'm going through something similar with the whole process but account has been locked since December 5th and I have a new card and still have not been unfrozen. Did the email thing with them sending ID and social front and back on December 24th still not open . . . .

One customer offered:

The poor guy in unemployment said they're working through it as fast as then can, but there are tens of thousands of us in the same situation. And they're already overburdened with their actual jobs. Bank of America put this on THEM, unemployment hasn't actually frozen our accounts like BofA said.

As a last example, one customer related:

I have the same issues since December 16 I was had $480 fraudulently taken from my account on Sahara and Fort Apache on Thanksgiving week while I was trying to use my card in Henderson. Complained to B of A and they told Detr and card was locked. Card is unlocked as of 1/17 but UI is still locked. They said I will receive a check in 3-5weeks for the back pay and card should be unlocked any day. Has anyone yet received their funds as of yet I haven't seen or heard of any success stories.

These are just a few of literally hundreds of complaints found on just one of the many websites where similar complaints have been posted.

52. *Commonality and Predominance.* Numerous common questions of law and fact exist as to the claims of Plaintiff and the other Class members. Such questions include, but are not limited to:

(a). Whether the Bank's agreement with customers was substantively identical during all portions of the Class Period?

(b). Whether the Bank violated its Zero Liability promise to customers?

(c). Whether BoA breached other contractual provisions?

(d). Whether the Bank failed to honor the requirements of the Electronic Funds Transfer Act and Regulation E?

(e). Whether the Bank failed to deliver funds to customers in accordance with its legal and contractual requirements?

(f). Any declaratory and/or injunctive relief to which the Classes are entitled.

53. Defendant has engaged in a common course of conduct toward Plaintiff and the other Class members. The common issues arising from this conduct that affect Plaintiff and the other Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

54. *Typicality.* Plaintiff's claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories. Further, Plaintiff and the members of the Classes were comparably injured through the uniform misconduct described above.

55. *Adequacy of Representation.* Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members; Plaintiff has

retained counsel competent and experienced in consumer class action litigation; and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

56. *Declaratory and Injunctive Relief*. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

57. *Superiority*. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I

## BREACH OF CONTRACT

### Plaintiff and the Zero Liability Class

58. Plaintiff re-alleges and incorporates by reference the above-enumerated paragraphs of this Class Action Complaint as though fully restated herein.

59. Plaintiff and every Class member had a substantively identical contract with BoA. The Bank's form contract was non-negotiable. The contract includes the "Zero Liability" promise including the following:

> **Bank of America's "Zero Liability" Policy for Unauthorized Transactions.** Federal law (described in the section below entitled "Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions") may limit your liability for unauthorized transactions on your Account, but you may still be liable in some circumstances. Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions . . .

Terms & Conditions, pp. 6-7 (attached hereto as Exhibit 1).

60. The Bank violated its own contract by failing to honor the various elements of its "Zero Liability" promise.

61. Plaintiff and the other Class members suffered substantial harm proximately caused by BoA as a result of its breaches of contract and will continue to suffer harm unless and until the relief requested herein is granted.

## COUNT II

## BREACH OF CONTRACT

### Plaintiff and the Remainder Funds Class

62. Plaintiff re-alleges and incorporates by reference the above-enumerated paragraphs of this Class Action Complaint as though fully restated herein.

63. Pursuant to the "Zero Liability" promise, Plaintiff and the members of the Remainder Funds Class should have no risk of losing their funds due to BoA's quitting the Nevada unemployment insurance program. The Bank has decided that honoring the "Zero Liability" promise is too expensive, however, and it has refused to honor it. For example, for the thousands of customers with funds remaining in their accounts, BoA has decided not to even contact them to let them know to remove their funds. Plaintiff's case illustrates the situation perfectly. The Bank could have reached him by any of several points of contact, but BoA chose not to do so. Luckily, Plaintiff became aware of the funds based on the 1099 form. Despite Plaintiff's best efforts, however, BoA still will not release his funds.

64. There are also other relevant provisions in the BoA form contract. For example, the contract requires the Bank to make customer funds available upon request whenever an account is closed, but the Bank does not honor this obligation:

> **Our Closure or Suspension of Your Account.** We may close or suspend your Account at any time. Your Card remains our property. We may cancel your right to use your Card at any time. Once your Account has been closed, you agree to discontinue using your Card. If we close your Account, we may, at our option, apply the remaining balance to a new account for your benefit. If you have not spent the remaining balance prior to Account closure, you may contact the Service Center to request a check for the remaining balance, less the Paper Check Fee.
>
> **Your Closure of Your Account.** If, at the time you close your Account, all transactions have cleared and there is no remaining balance, your Account will be closed to further use. If there is a remaining balance, you may use your Card to reduce the balance to zero before closing your Account. Alternatively, you can contact the Service Center to request a check for the remaining balance of your Account, less the Paper Check Fee, or request an Emergency Cash Transfer. You understand that you are responsible for negative balances that occur after your notice of closure to the same extent as provided in this Agreement for an open Account. You agree to destroy your Card after your Account is closed.

Terms & Conditions, p. 10.

65. There are also other provisions of the contract requiring BoA to safeguard customer funds and return such funds when requested by the customer. The Bank has breached these obligations.

66. Plaintiff and the other Class members suffered substantial harm proximately caused by BoA as a result of its breaches of contract and will continue to suffer harm unless and until the relief requested herein is granted.

## COUNT III

## UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED

### Plaintiff and the Classes

67. Plaintiff re-alleges and incorporates by reference the above-enumerated paragraphs of this Class Action Complaint as though fully restated herein.

68. Through the receipt and seizure of funds designated for Plaintiff and the Classes, BoA has been unjustly enriched through the receipt of such sums, which, in equity and good conscience, it ought not be entitled to retain.

69. Plaintiff and the other Class members have lost funds or, in the alternative, BoA has not expended funds to cover fraudulent losses which BoA was obligated to cover under its contracts and pursuant to federal law. The Bank, in equity and good conscience, has no right to retain these improperly attained or retained funds.

70. Plaintiff and the other Class members are entitled to a return of the monies BoA is holding unjustly or has avoided paying in violation of law.

## COUNT IV

**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA") AND REGULATION E INCLUDING 15 U.S.C. § 1693f AND 12 C.F.R. § 1005.6**
**Plaintiff and the Zero Liability Class**

71. Plaintiff re-alleges and incorporates by reference the above-enumerated paragraphs of this Class Action Complaint as though fully restated herein.

72. Plaintiff alleges this claim on behalf of himself and the Zero Liability Class members who have been assessed at least one fraudulent transaction on their BoA debit card account.

73. 15 U.S.C. § 1693f(a) provides that when a customer reports an error to the financial institution regarding the customer's account, that the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days.

74. 15 U.S.C. § 1693f(b) provides that, if the financial institution determines that an error did occur, it must promptly, within one business day, correct the error and credit the customer's account.

CLASS ACTION COMPLAINT
16

75. 15 U.S.C. § 1693f(c) provides that if a financial institution receives notice of an error in a manner consistent with Section 1693f(a), it may provisionally recredit the consumer's account for the amount alleged to be in error pending the conclusion of the investigation and determination of whether an error has occurred. In such an instance, the financial institution will then have 45 days to complete its investigation.

76. 15 U.S.C. § 1693f(d) provides that if the financial institution determines after its investigation that an error did not occur, it must deliver or mail to the consumer an explanation of its findings within three business days after the conclusion of its investigation. The financial institution must also, upon request, promptly deliver to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur.

77. Plaintiff, on behalf of himself and the Zero Liability Class, asserts that Defendant failed to:

    a. investigate alleged errors, determine whether errors have occurred, and report or mail the results of such investigation and determination to the consumer within ten business days as required by 15 U.S.C. § 1693f(a)(3);

    b. promptly, but in no event more than one business day after it was determined that an error did occur in situations where one if found, correct the error as required by 15 U.S.C. § 1693f(b);

    c. provide provisional credits to a customer's account in accordance with 15 U.S.C. § 1693f(c);

    d. deliver or mail to the consumer an explanation of their findings within three business days after the conclusion of the investigation in situations where Defendant determined that an error did not occur, and upon request of the consumer, promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur as required by 15 U.S.C. § 1693f(d); or

e. comply with the other provisions of EFTA and Regulation E.

78. Plaintiff, on behalf of himself and the Zero Liability Class, also asserts that Defendant failed to limit a consumer's liability for an unauthorized electronic fund transfer or a series of related unauthorized transfers in violation of 12 C.F.R. § 1005.6(b) and other statutory and regulatory provisions.

79. As a result of Defendant's violations of Regulation E, Defendant is liable to Plaintiff and the Zero Liability Class for actual and statutory damages, pursuant to 15 U.S.C. § 1693f(e).

80. As a result of Defendant's violations of EFTA and Regulation E, Defendant is liable to Plaintiff and the Regulation E Class for actual and statutory damages and Plaintiff and the Class are entitled to recover costs of suit and reasonable legal fees.

81. The BoA form contract incorporates the requirements of EFTA and Regulation E. *See* Terms & Conditions, p. 7. Thus, even if Plaintiff or any Class members could not rely on federal statutes and regulations, their claims would still succeed based on the Bank's breach of its own form contract.

**WHEREFORE**, Plaintiff, on behalf of himself and the Classes, seeks:

(a) a declaration from the Court that the Bank's practices breached its Zero Liability promise and other contractual obligations;

(b) preliminary and permanent injunctions forbidding Defendant from continuing to violate its contractual obligations;

(c) certification of the classes, as appropriately updated or revised after discovery, and designation of Plaintiff as class representative;

(d) compensatory damages, with interest, as needed to make Plaintiff and each Class member whole;

(e) a return of all monies held by Defendant unjustly;

(f) a declaration from the Court that the Bank's practices violated EFTA;

(g) award of statutory damages pursuant to EFTA, Regulation E, and the BoA contract;

(h) costs of the action;

(i) reasonable attorneys' fees and expenses as determined by the Court; and

(j) such other and further relief that the Court deems just and proper under the circumstances.

DATED:  February 28, 2022                    GEORGE O. WEST, III, Attorney at Law

By: */s/ George O. West III*
GEORGE O. WEST, III

*Attorney for Plaintiff and the Classes*

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all claims so triable.

DATED:  February 28, 2022                    GEORGE O. WEST, III, Attorney at Law

By: */s/ George O. West III*
GEORGE O. WEST, III

*Attorney for Plaintiff and the Classes*